UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| **DERWIN HUBBARD,** | ) |
| **Claimant,** | ) ) ) |
| vs. | ) ) Case No. 7:14-CV-1718-CLS |
| **CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration,** | ) ) ) ) ) |
| **Defendant.** | ) ) ) |

**MEMORANDUM OPINION AND ORDER**

Claimant, Derwin Hubbard, commenced this action on September 8, 2014, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner, affirming the decision of the Administrative Law Judge ("ALJ"), and thereby denying his claim for a period of disability, disability insurance, and supplemental security income benefits. For the reasons stated herein, the court finds that the Commissioner's ruling is due to be affirmed.

The court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of review is limited to determining whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and whether correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Tieniber v. Heckler*, 720 F.2d 1251, 1253

(11th Cir. 1983).

Claimant contends that the Commissioner's decision is neither supported by substantial evidence nor in accordance with applicable legal standards. Specifically, claimant contends that the ALJ improperly considered the opinion of John Goff, Ph.D., the consultative psychological examiner, and that he should have been found to be disabled under Listing 12.05C, addressing intellectual disability.

Listing 12.05C states as follows:

> *Intellectual disability.* Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C.   A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. . . .

20 C.F.R. pt. 404, subpt. P, appx. 1, § 12.05 (listings) (italics in original, ellipses supplied).[1]

---

[1] Effective September 3, 2013, the Social Security Administration replaced the term mental retardation with the term intellectual disability as a listed impairment. Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499, 46,4501 (Aug. 1, 2013) (to be codified at 20 C.F.R. pt. 404, subpt. P, app. 1). This change was made because "the term 'mental

The ALJ stated that "claimant does not have a <u>valid</u> verbal, performance, or full scale IQ score of 60-through 70 . . . ."[2] But he did not offer any explanation for that finding, and the evidence does not support it.  To the contrary, intelligence testing conducted by Dr. John Goff, the consultative psychological examiner, resulted in a full-scale IQ score of 65.  There are no other contradictory scores in the record.  Moreover, it cannot seriously be contested claimant has physical impairments that impose significant work-related limitations of function.  Indeed, the ALJ found that claimant's chronic sinusitis was a "severe impairment."[3]

Even so, the ALJ also found that claimant did not satisfy the prefatory criterion of the Listing, *i.e.,* "deficits in adaptive functioning initially manifested during the developmental period."  The court agrees with that conclusion and finds that it is supported by substantial evidence of record.  Claimant's long work history, which apparently ended for reasons unrelated to his level of mental functioning, along with his ability to perform basic personal tasks like driving, paying bills, and performing

---

retardation' has negative connotations," and "has become offensive to many people." *Id*. at 46,499. But this change "d[id] not affect the actual medical definition of the disorder or available programs or services." *Id.* at 49,500.

*Frame v. Commissioner, Social Security Administration*, – F. App'x – , 2015 WL 150733, *2 n.2 (11th Cir. Jan. 13, 2015) (alteration in original).  Thus, even though the ALJ's decision was "issued before the change took effect," this court, like the Eleventh Circuit panel in *Frame,* will "follow the agency's new nomenclature." *Id.* at *2 n.2.

[2] Tr. 21 (emphasis in original).

[3] Tr. 19.

self-care functions, indicate that he did not suffer from significant adaptive limitations that manifested during the developmental period. *See, e.g., Garrett v. Astrue*, 244 F. App'x 937, 939 (11th Cir. 2007) (holding that the claimant's ability to cook simple meals, perform household chores, build model cars, attend church, watch television, play cards, and walk in the mall were inconsistent with a finding of significant impairment of adaptive functioning); *Outlaw v. Barnhart,* 197 F. App'x 825, 827 (11th Cir. 2006) (stating that the claimant's "long work history in semi-skilled positions and daily activities were inconsistent with his adult IQ scores," which were below 70); *Humphries v. Barnhart*, 183 F. App'x 887, 889 (11th Cir. 2006) (holding that substantial evidence supported the ALJ's finding that the claimant did not have deficits in adaptive functioning when she worked in a school cafeteria for 21 years and served as the manager for about 15 years).

Claimant contends that the ALJ should have relied upon the assessment of Dr. John Goff, the consultative psychological examiner, because Dr. Goff found that claimant *did* experience deficits in adaptive functioning. Social Security regulations provide that, in considering what weight to give *any* medical opinion (regardless of whether it is from a treating or consultative physician), the Commissioner should evaluate: the extent of the examining or treating relationship between the doctor and patient; whether the doctor's opinion can be supported by medical signs and

laboratory findings; whether the opinion is consistent with the record as a whole; the doctor's specialization; and other factors. *See* 20 C.F.R. § 404.1527(d). *See also Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986) ("The weight afforded a physician's conclusory statements depends upon the extent to which they are supported by clinical or laboratory findings and are consistent with other evidence as to claimant's impairments.").

Dr. Goff examined claimant on March 22, 2012, upon referral by his attorney, and reviewed claimant's medical records, although they were "very sparse."[4] He also reviewed claimant's work history report, and stated:

> I do not think [claimant] knew how to fill out the form and I really cannot read it particularly. Under the job title he has written light foot encon twice and then buddy and hou-encom. [*sic*] Then he has written the word "lunnutt" [*sic*] repeatedly, 7 times and he has written the word "turner" as his job title. Sometimes he has written the word "turnne" [*sic*].[5]

During the examination, claimant reported having graduated from high school, but he did not know whether he received a regular diploma or a certificate of attendance. Claimant did recall repeating the seventh grade and being enrolled in special education classes "throughout the majority of his academic career."[6] Claimant's work history consisted primarily of digging tunnels, and Dr. Goff

---

[4] Tr. 233.

[5] *Id.* (alterations supplied).

[6] Tr. 234.

surmised that when claimant wrote "turner" and "turnne" on the work history report, he likely intended to write "tunnel" instead. Claimant reported working as a tunnel digger for the same company until 2008, when the work "ran out."[7]

Claimant denied any depression, delusions, hallucinations, apprehension, or anxiety. His recent and remote memory were intact, and he was fully oriented in all areas. He could recite the alphabet and count backwards from 20, but he made errors in performing serial three addition. His logical memory for verbal material was very poor.[8]

Intelligence testing revealed a full-scale IQ score of 65, which was within the mild mental retardation range. Claimant also received a verbal comprehension score of 63/1, a perceptual reasoning score of 67/1, a working memory score of 69/2, and a processing speed of 84/14. Other than the processing speed score, which was low-average, all of those scores were within the mildly retarded range. An aphasia screening test revealed good drawings, but "extraordinarily bad" spelling, inability to read a sentence at the second grade level, and inability to perform simple mathematical calculations. The informal clock drawing test resulted in a "fairly well drawn clock," but claimant "did not place the hands correctly."[9] Claimant's math

---

[7] Tr. 234-35.
[8] Tr. 235.
[9] Tr. 236.

ability scores were at the mid-fourth-grade level, suggesting that "he is able to perform very simple mathematical calculations such as simple addition and subtraction and perhaps multiplication but not division or the use of decimals or fractions."[10]  Claimant's word reading and spelling scores were at the ending second grade level, reflecting functional illiteracy.[11]

Dr. Goff concluded that claimant was functioning within the mildly mentally retarded range of psychometric intelligence.  He had not reviewed claimant's school records, but he doubted that claimant would be able to pass a graduation exit examination due to his inability to read at a functional level.  Claimant's academic achievements were at second grade and fourth grade levels.  Claimant was functionally illiterate.  He could drive, but he depended on his father for transportation because he lost his license as a result of failure to pay parking tickets.  Dr. Goff did not assess any thought or mood disorders "or any other significant functional psychological disturbance," and claimant had no history of mental health treatment.[12]  Dr. Goff's conclusions were as follows:

1. [Claimant] obtains IQ test scores within the mildly retarded range of psychometric intelligence.

2. He is functionally illiterate.

---

[10] *Id.*

[11] *Id.*

[12] Tr. 237.

    3.     There are other adaptive skills deficits present.

    4.     He indicates a history of special education placement though we do not have any school records.

    5.     His finger apparently hurts but I do not think it is a substantial interfering factor. It may interfere with some kinds of vocational activity.

    6.     Diagnosis:

        Axis I:  Reading Disorder, Moderate to Severe

        Axis II:  Mental Retardation, Mild.[13]

Finally, Dr. Goff stated: "This man's cognitive deficits represent severe impairment."[14]

Dr. Goff also completed a "Mental Source Opinion Form (Mental)," although the form was neither signed nor dated. He indicated that claimant experienced mild limitations of his abilities to carry out and remember simple instructions, respond appropriately to supervision and co-workers, respond to customary work pressures, maintain activities of daily living, and maintain personal habits. Claimant would experience moderate limitations of his abilities to understand simple instructions, remember detailed or complex instructions, deal with changes in a routine work setting, respond appropriately to customers or other members of the general public,

---

[13] *Id.* (alteration supplied).
[14] Tr. 238.

and use judgment in simple one-or-two-step work-related decisions. He would experience marked limitations of his abilities to understand and carry out detailed or complex instructions, use judgment in detailed or complex work-related decisions, maintain attention and concentration for periods of at least two hours, and maintain personal interests. All of those limitations had been present for at least twelve months, and they were expected to last the remainder of claimant's lifetime. Claimant would not be able to manage benefits in his own best interest. Finally, Dr. Goff indicated that claimant demonstrated deficits in adaptive functioning manifested prior to age 22 in three areas: *i.e.,* self-direction; work; and functional academic skills. Other adaptive functioning areas (*i.e.,* communication, health, self-care, safety, home living, leisure, social/interpersonal skills, and use of community resources) were listed on the form, but Dr. Goff did not indicate that claimant was impaired in those areas.[15]

The ALJ afforded Dr. Goff's assessment only "limited weight" for three reasons: *i.e.,* (1) because the opinion was "not consistent with the totality of the evidence"; (2) because "Dr. Goff was a one-time examiner who had no treatment relationship with the claimant"; and (3) because "Dr. Goff was 'hired by the claimant's attorney to render an evaluation in preparation for litigation.'"[16] Those are

---

[15] Tr. 239-40.
[16] Tr. 24.

all permissible considerations, so the only remaining question is whether ALJ's conclusions were supported by substantial evidence of record.

As an initial matter, the ALJ criticized "the speculative nature of Dr. Goff's estimating and approximating an IQ score of the claimant . . . ."[17] That observation simply is not supported by the record. Dr. Goff did not speculate as to claimant's IQ score; he determined the score after conducting standardized intelligence testing.

It appears that a major reason for the ALJ's rejection of Dr. Goff's opinion was that Dr. Goff's methods had been criticized in an opinion from another district court in this Circuit.[18] In *King v. Apfel*, No. CIV.A. 99-0132-RV-M, 2000 WL 284217 (S.D. Ala. Feb. 29, 2000), an unreported decision, the Magistrate Judge (whose findings were adopted by the district court) approved of the ALJ's rejection of Dr. Goff's assessment of disabling limitations. Specifically, the Magistrate Judge found that "Dr. Goff's assessment of [the claimant's] abilities was so out of line with the balance of the evidence that the ALJ found it lacking objective support." *Id.* at *2 (alteration supplied). The Magistrate Judge also observed that "everything else in the record is counter to the extreme findings of Goff." *Id.* Those statements amount to nothing more than the court's agreement with the ALJ's decision to reject Dr. Goff's

---

[17] Tr. 25.

[18] *Id.* ("In viewing a neighboring Eleventh Circuit Federal Court opinion, there appears to be a history of questionable veracity to the opinions submitted by this consultant as Judge Milling has been critical of Dr. Goff's paid-for opinions.").

findings *in that case* as unsubstantiated and contrary to the record. The rejection of Dr. Goff's opinion in a single case that was decided fifteen years ago cannot reasonably form the basis for rejecting, or even affording extra scrutiny to, his opinions in this case. Instead, Dr. Goff's assessment will be independently evaluated for its supportability and consistency with the remainder of the record.

The remainder of the ALJ's observations require closer consideration. The ALJ stated:

> Another area of Dr. Goff's report that is inconsistent with the evidence of record is his opinion of a serious degree of adaptive deficits of the claimant. The evidence of record does not support such extreme adaptive deficits, but rather just lays out indicators of borderline intellectual functioning by history with some corroboration by reported psychometric testing. Specifically, the claimant has had no difficulty in maintaining employment as the record had indicated a well-established history of work activity with several years of work activity in excess of substantial gainful activity levels. Dr. Goff completely failed to address the claimant's work history in his overall assessment of his intellectual capability as well as his ability to adapt to the various work environments, handle work stress, follow instructions, and interact with co-workers and supervision, all of which are reasonably implied by such sustained work activity. Moreover, and of significance in this case, the claimant testified that he left his job after the "job played out" and the record supports the same as well as testimony that he could <u>still</u> perform his former job as a tunnel machine operator. While the claimant does have a history of special education, he was able to receive a certification of completion of the twelfth grade. In addition, according to part of Dr. Goff's sub-testing (WRAT), the claimant scored word reading, spelling and math at the mid-fourth grade level, which the vocational expert testified would allow the claimant to perform the jobs indicated below. Accordingly, the undersigned does not accept Dr. Goff's conclusions with regard to the claimant's mental functional capacity and very limited

11

weight is given to the assessment/opinions for reasons set forth above.[19]

Two of those statements are incorrect. First, claimant's hearing testimony was not that he could *still* perform his former job. Instead, he testified that, *at the time the job came to an end in 2006*, he could still have performed it. He testified that he would *not* be able to perform that job at the time of the administrative hearing, which was conducted on May 9, 2012.[20] Secondly, only claimant's math scores were at the mid-fourth-grade level. His scores for spelling and reading were at the ending second-grade level, indicating functional illiteracy.

Those errors aside, both of which appear to have been careless, this court concludes that the ALJ's decision to discredit Dr. Goff's opinions about claimant's adaptive functioning was supported by substantial evidence. As discussed above, Claimant's long work history, which apparently ended for reasons unrelated to his level of mental functioning, along with his ability to perform basic personal tasks like driving, paying bills, and performing self-care functions, support the ALJ's decision to reject Dr. Goff's opinion about claimant's adaptive functioning.

In summary, while the ALJ's administrative decision was not perfect and contained several incorrect observations about the record, his essential findings about claimant's disability *were* supported by substantial evidence and in accordance with

---

[19] *Id.* (emphasis in original).
[20] *See* Tr. 41, 59.

applicable law. Accordingly, the decision of the Commissioner is AFFIRMED. Costs are taxed against claimant. The Clerk of Court is directed to close this file.

DONE this 1st day of May, 2015.

_____
United States District Judge